UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Jamar Givens,

Plaintiff,

vs.

Eric McClintic, et al,

Defendants.

Case No. 1:11-cv-0558

**ORDER**

Before the Court is Defendants' motion for summary judgment. (Doc. 28) Plaintiff has responded (Doc. 30), and Defendants have filed their reply. (Doc. 33) Plaintiff's complaint alleges that the Defendants Eric McClintic, Donald Palmer, Derek Barbee, Denny Clark, and Scott Runnels, all of whom were corrections officers ("Youth Specialists") at the Ohio River Valley Juvenile Correctional Facility, used excessive force against him and/or failed to protect him during an incident that occurred on December 30, 2010.

Defendants also filed a motion to amend their summary judgment motion, in order to raise a qualified immunity defense. (Doc. 32) This defense was raised in their answer but not specifically addressed in their Rule 56 motion. Plaintiff has not opposed the motion to amend, and for that reason it is granted.

For the following reasons, the Court grants in part and denies in part the motion.

**FACTUAL BACKGROUND**

Plaintiff Jamar Givens was in the custody of the Ohio River Valley Juvenile

Correctional Facility ("JCF"), assigned to the Taft Unit.  Givens admitted that he was a member of a gang at JCF, and that there were a "lot of tough guys" on his unit.  YS Barbee testified that the Taft Unit had a violent reputation, and that the residents would regularly warn various officers that they were going to be assaulted.  (Barbee Dep. at 28-30)  One of Barbee's colleagues, YS Anderson, was assaulted by three residents and had his jaw broken shortly before the incident giving rise to this case.  (Barbee Dep. at 21, 30)  After that incident, the officers were instructed to tighten their security measures in various ways, including moving in pairs.  The officers were told, "... hey, keep your eyes open, be a little more aware.  It's not necessarily a policy.  It's make sure you know every day that you can get hurt and do what you can to keep yourself safe.  That's more or less what they told us."  (Barbee Dep. at 32)   A couple of days before the December 30 incident, Barbee overheard a resident, A.M. (allegedly the leader of the gang to which Givens belonged), tell another resident that Barbee would be the next officer to "get clapped out" (gang-slang for an attack on an officer).  (Barbee at 35)  Barbee testified that he reported what he overheard to his superiors.

On December 30, 2010, Givens said that the day began normally.  He decided he wanted to clean his room, which he often did, and asked YS Palmer to allow him access to a mop closet so he could get the mop and water bucket.  Palmer opened the closet door, but was already in the process of escorting two other residents to the recreation area to get snacks, so Palmer asked Barbee (who was standing close to the closet at the time) to supervise Givens while he obtained materials in the mop closet. (Palmer Dep. at 55)  Palmer left the Taft Unit with the two residents and did not return until later.

At this point, the parties sharply disagree about the events that next transpired. Givens alleges that while he was in the closet, Barbee came in and kicked the mop bucket, which he had already filled. Barbee then threw the mop wringer into the bucket, splashing water from the bucket on Givens. YS Denny Clark (who was standing outside the closet when Givens first went in) came into the closet, and he and Barbee grabbed Givens by his shirt and shoved him up against the closet wall. At that point, other YS officers arrived and came into the closet, and the group started hitting Givens. They eventually pulled him to the floor, face down, and YS Runnels pulled Givens' left arm behind his back and punched it until it snapped. (Givens Dep. at 33-48) Givens alleges that Eric McClintic, the unit supervisor, was outside the closet by then and told Runnels to "get him good." (Givens Dep. at 55) When Givens' arm snapped, McClintic said "that's enough." (Id.)

Defendants contend that Givens provoked the incident by throwing the mop bucket at Barbee's legs while they were inside the closet. (Barbee Dep. at 42; Clark Dep. at 34) Soapy water spilled on the closet floor as a result. Givens rushed Barbee and struck him on the side of his head; Barbee was not sure what Givens used, but Clark said it was the mop handle. Clark immediately called the emergency assistance signal ("88"), and McClintic and Runnels arrived in short order. Givens had by then put Barbee into a headlock, and Runnels ordered Givens to stop. When Givens ignored those requests, Runnels approached Givens to try to sweep his legs out from under him, in an effort to force Givens to release Barbee. Givens punched Runnels in the face. Clark and Barbee each managed to get hold of one of Givens' arms and attempted to place him in a restraint position, but they were unsuccessful. Then all

three of them slipped in the soapy water and fell to the floor. The officers managed to turn Givens on his stomach and again attempted to restrain him. Several more officers arrived at the closet, and testified that Givens was resisting their efforts and refusing to put his hands up. The officers finally managed to handcuff Givens, and he was taken to an isolation room.

Robert Crabtree, a JCF nurse, assessed Givens' condition after the incident. Crabtree noted that Givens' left arm was hanging in a dependent position; Givens was unable to move it and was in significant pain. Givens had swelling and redness to both sides of his face and nose, bruising at the end of his nose, and three superficial abrasions with dried blood present on the left side of his neck. Crabtree arranged for Givens to be taken to the emergency room at the Southern Ohio Medical Center (SOMC). (Doc. 28, Ex. 1 at CM/ECF PAGEID #334) Givens was given an x-ray but the hospital did not detect a fracture. However, a subsequent x-ray confirmed that Givens had a non-displaced fracture of the mid-humerous bone in his left arm. Dr. John Bradley, DYS Medical Director, was interviewed as part of the post-incident investigation. Dr. Bradley reviewed Givens' medical records (which included two radiology reports, one from SOMC and one from Mobilex Radiology) and confirmed that his arm was fractured. (Id. at CM/ECF PAGEID # 340, documenting a January 21, 2011 interview with Dr. John Bradley.) Dr. Bradley stated that the fracture could have resulted from a punch, or from falling on the arm, or from throwing the arm against a stationary object. The investigator's review of the facility's activity management system records did not document any incident involving Givens between December 30, 2010 and January 13, 2011 that might account for his broken arm. (Id.)

Barbee, Runnels, and Clark were also transported to the SOMC ER that afternoon; according to Dr. Bradley, Barbee complained of dizziness and loss of consciousness while in the mop closet. Runnels was seen for being punched in his right eye, and was diagnosed with facial contusions and a possible closed head injury. Clark complained of a swollen right finger, right hip and knee pain, and left ankle pain. (Id.)

The Ohio Department of Youth Services conducted an investigation into the incident, including multiple interviews with all of the alleged participants. (See Affidavit of Jennifer Fears and Report of Investigation, Doc. 28, Ex. 1) The investigator, Terri Jacobs, ultimately concluded that Givens' allegation that staff fractured his left arm and abused him during the incident was unsubstantiated. She noted that:

> - Medical evidence does support that youth Jamar Givens sustained a fracture of his left humerous.
>
> - Medical Director Dr. John Bradley stated that the x-ray of the left arm showed a non-displaced fracture of the mid humerus which is consistent with perpendicular trauma to the arm.
>
> - Dr. Bradley stated that the fall that occurred in the mop closet could have caused the fracture to youth Givens' arm.
>
> - There are no youth or staff witnesses that saw youth Givens being punched in his left arm.
>
> - There is no physical evidence that youth Givens was choked and repeatedly punched by staff.

(Id. at PAGEID # 349)

After exhausting the administrative grievance procedures at the JCF, Givens filed a pro se complaint in this Court on August 16, 2011 against McClintic, Palmer, Barbee, Clark and Runnels, all in their individual capacities. (Doc. 3) He generally alleges:

> Defendants Palmer and Barbee calculatedly arranged to be alone with Plaintiff, outside of the scope of the unit cameras, so Defendant Barbee could assault Plaintiff. Defendants Clark and Runnels allowed and participated in committed acts of unnecessary and excessive force against Plaintiff. Finally, Defendant McClintic demonstrated deliberate indifference to Plaintiff's safety and security when he failed to intervene on behalf of Plaintiff and verbally encouraged the Defendants to abuse Plaintiff. Defendants' actions and inactions violated Plaintiff's rights under the Eighth and Fourteenth Amendments of the United States Constitution as protected by 42 U.S.C. § 1983.

(Doc. 3, ¶1) Count One of his complaint is a claim for excessive force against Barbee, Clark and Runnels. Count Two alleges that Palmer and McClintic failed to protect him from the Defendants named in Count One. Givens seeks compensatory and punitive damages against all five of the Defendants. Givens also filed a motion seeking the appointment of counsel to represent him. That motion was granted, and the Magistrate Judge appointed David Singleton, of the Ohio Justice and Policy Center, to represent Givens. (Doc. 7)

    Defendants' motion for summary judgment contends that there are no genuine issues of material fact as to whether they used excessive force or failed to protect Givens. They argue that on the basis of the evidence in the record, no rational trier of fact could conclude that Givens' claims have merit. And given the lack of a factual dispute, they also contend they are entitled to qualified immunity. Givens responds that Defendants are essentially asking the Court to determine the credibility of the witnesses, because Givens' account of the event materially differs from that offered by the Defendants. And witness credibility determinations are not the province of the Court under Rule 56, but are reserved for the trier of fact.

## ANALYSIS

Standard of Review

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An assertion of a undisputed fact must be supported by citations to particular parts of the record, including depositions, affidavits, admissions, and interrogatory answers. The party opposing a properly supported summary judgment motion "'may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation omitted). The evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. Id. at 255 (citing Adickes v. S.H Kress & Co., 398 U.S. 144, 158 (1970)). However, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of events is "blatantly contradicted by the record, so that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007).

The Court is not duty bound to search the entire record in an effort to establish a lack of material facts. Guarino v. Brookfield Township Trs., 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita

Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

The court construes the evidence presented in the light most favorable to the non-movant, and draws all justifiable inferences in the non-movant's favor. United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

Excessive Force

The Eighth Amendment's prohibition against cruel and unusual punishment governs an inmate's excessive force claim. Pelfrey v. Chambers, 43 F.3d 1034, 1036-37 (6th Cir. 1995). To succeed on such a claim, Givens must establish that the officers used force against him that was not justified by the circumstances. Hudson v. McMillian, 501 U.S. 1, 7 (1992); Pelfrey, 43 F.3d at 1037. In determining if the force used was justified, the Court should consider the extent of any injury resulting from the use of force; the reasons given by the defendant for the need to use force; the type and amount of force used; the threat that was reasonably perceived by a responsible officer at the time; and whether efforts were made to lessen the amount of force that was used. See Hudson, 501 U.S. at 7; Moore v. Holbrook, 2 F.3d 697, 700 (6th Cir. 1993).

The Eighth Amendment does not prohibit a de minimis use of force "provided that the use of force is not of a sort 'repugnant to the conscience of mankind.' " Hudson, 501 U.S. at 10; Lockett v. Suardini, 526 F.3d 866, 875 (6th Cir. 2008). What constitutes a de minimis use of force depends upon the circumstances of each case. "[T]he core judicial inquiry is ... whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. For instance, a guard who beats a handcuffed, submissive prisoner causing bruises, swelling, loosened teeth, and a cracked dental plate inflicts injuries that are more than de minimis

for Eighth Amendment purposes. Hudson, 501 U.S. at 10.

Defendants argue that Givens was not harmed by the use of excessive force, because the force they used was de minimis and was justified by Givens' sudden attack on Barbee, throwing the mop bucket at him. They cite the fact that Givens was a known member of the gang called the "Heartless Felons." Barbee had reported overhearing A.M., the gang's leader, telling another inmate that Barbee would be the next victim of a gang attack. Palmer testified that he also heard a threat from another inmate, who told Palmer that he "could be next." (Palmer Dep. at 39) Defendants argue that substantial evidence supports their version of the incident, that Givens attacked Barbee, and no evidence suggests Defendants planned an attack on Givens.

With respect to the alleged "plan" by Barbee and Palmer, Defendants note that Palmer left the unit before Barbee went into the mop closet, and did not return until after the incident was over. Defendants suggest that if Palmer was part of a "plan," he would have wanted to be there with Barbee when the assault on Givens took place. They further note that Barbee had already filed his report about the gang's plan to assault him. Defendants suggest that the report would only have heightened the level of supervision of all gang members, and made any planned attack on Givens much more difficult as a result. Barbee also testified that he had ordered a meal from an outside vendor at the time that Palmer asked him to supervise Givens, suggesting that he had no "plan" to attack Givens. Barbee, Runnels and Clark were all injured in the incident; given their physical size, they suggest that any "plan" to assault Givens would have been executed in such a way that none of them would have been injured. Finally, they note that Clark testified that he called the emergency signal immediately after the

bucket was thrown.  (Clark Dep. at 34)  This occurred prior to any force being used by anyone, under both parties' versions of the events.  Once the signal was sounded, Barbee would know that other officers would immediately respond and would witness any planned attack on Givens.  And if Barbee truly planned to get Givens alone and out of range of the security cameras, he would not have hit Givens after an emergency signal was broadcast by a fellow officer.

Defendants also cite what they describe as inconsistencies in Givens' story over time.  In his initial statement on January 3, 2011, Givens said that Barbee "knocked the water over and began hitting me and Mr. Clark ran in.  I hit my head on the wall and they took me to the floor ...".  (Doc. 28, Ex. 1 at CM/ECF PAGEID # 356)  During his first interview with the investigator on January 14, Givens said that Barbee picked up the wringer mechanism and "dropped it into the full mop bucket splashing water on him and then Mr. Barbee kicked the mop bucket and water splashed out on (Givens') pants and shoes."  (Id. at PAGEID # 330)  At a February 9 follow-up interview, Givens said that the floor of the closet was wet with mop water.  The investigator's notes state:

> He was asked why he did not mention the water on the floor during the first interview; he stated that he did not see that as important as the other information regarding the incident. Youth Givens was asked how much water was on the floor; he said that he is not sure but he stated that before the incident the mop bucket was nearly full.  He said that when Barbee dropped the wringer into the bucket some water splashed out and then when Barbee kicked the mop bucket over the rest of the water came out.  Youth Givens was asked if the floor was slippery, he said yes.  He stated that he slipped when he tried to run out of the closet.  Youth Givens said that when he slipped he hit the back of his head on the wall of the closet but did not fall down at that time. Youth Givens was asked how he got on the floor; he said that after he hit his head he was unsteady on his feet and

> staff grabbed him, punched him several times and took him down quickly.

(Id. at PAGEID # 345) In his deposition, Givens said that after Barbee kicked the bucket, "the water splashed out." (Givens Dep. at 29) When he was asked if he was holding the bucket or if it was on the ground, Givens said: "I don't remember what I was doing. He kicked the bucket, though, and the water had splashed." (Id. at 31) A short time later, the following exchange took place:

> Q: And then he picked up the bucket -- or he kicked the bucket, I'm sorry, and it got water on you?
>
> A. It splashed. It didn't -- I don't remember.
>
> Q. Okay. Did water get on the floor?
>
> A. Probably. I don't remember.
>
> Q. Do you remember the floor being slippery from the water?
>
> A. The floor wasn't slippery at all.

(Id. at 34)

Defendants contend that Givens' conflicting stories about how the water got on the floor and what caused him to fall on the floor, combined with the lack of evidence that Givens' story is credible, provide a sufficient basis upon which to grant Defendants judgment. They argue that no reasonable jury could conclude that Givens' version of the facts is accurate, and that the only reasonable conclusion is that Givens caused his own injuries by his aggressive actions toward Barbee, which led to Givens and the three officers slipping on the wet floor and sustaining injuries.

Numerous court decisions address the proper resolution of disputes in which the

plaintiff and the defendants have factually divergent accounts of how the incident happened.  No videotape is available here that could clearly establish which version of the facts is the correct one.  The only direct witnesses to the incident are the parties.  The Sixth Circuit has cautioned that discrepancies in a plaintiff's story over time, or skepticism over an injury sustained in the manner described by plaintiff, do not compel the court to reject the plaintiff's version of events.  In Crooks v. Hamilton County, Ohio, 458 Fed Apx. 548 (6th Cir. 2012), the Sixth Circuit reversed a summary judgment granted to a deputy sheriff on an excessive force case in which plaintiff alleged that handcuffing her behind her back instead of in front, as she had asked the deputy to do, caused a fractured rib.  An initial x-ray immediately after the incident did not reveal any injuries, but a second x-ray about two weeks later suggested she had a rib fracture.  The Sixth Circuit noted that "the key point is that any skepticism of her injury is not "so objectively compelling that no reasonable juror could believe Crooks's explanation." Id. at 550, citing Shreve v. Jessamine Cnty. Fiscal Court, 453 F.3d 681, 688 (6th Cir. 2006).

     In Shreve, two sheriff's deputies went to execute an arrest warrant for the plaintiff at her home.  The deputies saw her through the windows but she refused to answer the door or the telephone, so they forcibly entered and searched the home.  The plaintiff hid in a bedroom closet under a blanket; when the deputies came into the room, they told her to come out but she continued to hide.  The deputies sprayed pepper spray into the closet, and ripped the blanket away, grabbed her by her hair and wrist, and threw her on the bedroom floor.  Plaintiff alleged that one of the deputies started jumping on her back with his knee, and that the pepper spray made her incoherent; when the effects of the

spray lessened, she said that someone was still hitting her back. After getting handcuffs on her, one of the deputies continued to hit her with a club. Photographs taken about five days later, while she was being held in jail, showed some discoloration below her right eye, but no significant swelling or other visible signs of severe injury. The deputies denied hitting her or dragging her on the floor; they said that once she came out of the closet, he placed his knee on top of her back until they could handcuff her. The deputies admitted that she did not "actively" resist them, but "passively" resisted by refusing to put her arms out for handcuffs. The district court granted summary judgment to the deputies, reciting their version of the incident and rejecting plaintiff's claims that she was hit in the face and back. The court noted that she admitted that she could not see either of the deputies hit her, and she had no medical documentation of her claimed injuries to her neck, back, and shoulder. The photographs taken in jail five days later revealed injuries that "could have been completely consistent with a reasonable use of force." Id. at 686.

The Sixth Circuit reversed. The court noted:

> [A]ll witnesses except the plaintiff testified consistently to a version of events in which no excessive force occurred. Shreve, however, swore to a version of the facts that does amount to excessive force. To be sure, there are inconsistencies in Shreve's statements: she did not see the deputies holding nightsticks while hitting her, and there is not much physical evidence in support of her version of events. She did however testify that she felt the stick hitting her and that she saw a deputy holding a stick at some point. It is therefore ultimately up to the jury to believe her or not. This is not a case where the defendants' evidence is so objectively compelling that no reasonable juror could believe Shreve.

Id. at 687-688.

Here, Givens contends that Barbee instigated the incident, and that the officers beat on his arm until it was broken. The officers contend that Givens instigated the incident by throwing the bucket at Barbee. There is no dispute that Givens suffered an arm fracture. And Dr. Bradley told the investigator that the fracture could have been caused by a blow to his arm such as Givens described, or by a fall on the floor, or by throwing his arm against a wall. There is no indisputable documentary or videotape evidence that could resolve these factual disputes. In light of the evidence, and construing the facts most favorably to Givens, the Court cannot conclude that Givens' version of the facts is "blatantly contradicted by the record" so as to justify granting summary judgment to Barbee, Runnels and Clark on Givens' excessive force claim. See Scott v. Harris, 550 U.S. 372, 380 (2007) (holding that summary judgment for defendant was appropriate where plaintiffs version of the facts were contradicted by genuine videotape evidence). And see Coble v. City of White House, 634 F.3d 865 (6th Cir. 2011), noting that even if part of the plaintiff's testimony about the police officer's conduct was blatantly contradicted by an audio recording, "that does not permit the district court to discredit his entire version of the events. We allow cases to proceed to trial even though a party's evidence is inconsistent, because in reviewing a summary judgment motion, credibility judgments and weighing of the evidence are prohibited." Id. at 870 (internal citations and quotation marks omitted).

Because of these factual disputes, the Court also concludes that these three Defendants are not entitled to qualified immunity on this claim.

Failure to Protect

Givens alleges that McClintic and Palmer failed to protect him from the excessive

force used by the other three Defendants. Givens testified that McClintic stood in the door of the closet while the other officers assaulted him, and that McClintic urged the officers to "Get him good." McClintic then said "That's enough" after Runnels broke his arm. (Givens Dep. at 37-38) McClintic testified that when he arrived at the closet, Givens had Barbee in a headlock. This factual dispute precludes granting summary judgment to McClintic, for the same reasons discussed above with respect to Givens' excessive force claim.

Givens' complaint alleges that Palmer intentionally arranged to be alone with Givens, away from the cameras, so that Barbee could assault him. But Givens testified that he decided to clean his room the day of the incident, and he asked Palmer to let him into the mop closet. Palmer did so and left the unit with two other residents. It was Givens that approached Palmer on that day, and not the other way around. Givens also testified that toward the end of the incident in the closet, there were several officers in the closet with him, including Palmer (and another officer not named as a defendant in this case). But he makes no specific allegations against Palmer with respect to his claim that Palmer failed to protect him. The Court concludes that Givens has not established a genuine factual dispute regarding his claim against Palmer.

**CONCLUSION**

For all of the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part. The Court grants the motion with respect to Plaintiff's claims against defendant Donald Palmer, and those claims are dismissed with prejudice. The motion is denied with respect to the claims against Defendants Barbee, Clark, Runnels, and McClintic.

Defendants' motion to amend/correct the summary judgment motion in order to raise arguments concerning qualified immunity (Doc. 32) is unopposed, and is granted. However, due to the factual disputes surrounding the incident, the Court concludes that Defendants Barbee, Clark, Runnels, and McClintic are not entitled to qualified immunity.

Pursuant to the scheduling order previously entered, the final pre-trial conference will be held on December 17, 2013 at 1:30 p.m.

SO ORDERED.

DATED: November 5, 2013                    s/Sandra S. Beckwith
                                           Sandra S. Beckwith, Senior Judge
                                           United States District Court